## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KATHLEEN F. CAHILL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| COFFEYVILLE REGIONAL | ) | |
| MEDICAL CENTER, INC. | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

COMES NOW the plaintiff, Kathleen Cahill ("Plaintiff") and for her claims for relief against the defendant, Coffeyville Regional Medical Center, Inc. ("Defendant"), states and alleges as follows:

## THE PARTIES

1.      Plaintiff is an individual who resides in Albuquerque, New Mexico.

2.      Defendant is a Kansas not-for-profit corporation doing business in Kansas.  Defendant may be served with process by serving Cheryl Batchelor at Coffeyville Regional Medical Center, 1400 W. 4th Street, Coffeyville, KS 67337.

## JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction and federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because Defendant, a not-for-profit corporation, is subject to personal jurisdiction in Kansas.

## BACKGROUND

5.      Defendant is a 501(c)(3) non-profit, city-owned 88-bed hospital and medical center located in Coffeyville, Kansas.

6.      Defendant is managed by a Board of Directors comprised of seven members. Judy Hiner is the current chairman of the Board.

7.      In early 2014, the Board ended the employment contract of its Chief Executive Officer, hired an interim CEO, and began a nationwide search for a new CEO.

8.      Plaintiff was at that time looking for a new position as a CEO for a hospital and applied for Defendant's open position.

9.      At the time Plaintiff applied for this position, she was living in Albuquerque, New Mexico.

10.      Prior to applying for this position, Plaintiff had been working in healthcare for 37 years and had been a CEO at various hospitals for nearly 30 of those years.

11.      Plaintiff submitted a resume with her application in March 2014.  The resume was crafted to highlight the positions she had held which she believed to be the most relevant to those she was applying for.  Plaintiff did not include every job she had held both in order to keep her resume at a manageable length and because she did not believe every job was relevant.  Her resume was intended to highlight her skills, not to be a complete employment history.

12.      Plaintiff's resume contained a mistake as to dates.  Her resume indicated she had been CEO at North Valley Hospital and Medical Center in Denver, Colorado from 2004 to 2008, but the "2004" should have been "2006."  Likewise, her position at Summit Hospital of Southeast Arizona in Tucson was listed on her resume as having been from 1998 to 2004, but

"2004" should have been "2003." Plaintiff was not aware at the time she submitted her resume to Defendant of the date errors.

13.     All other information on the resume submitted to Defendant was correct, including Plaintiff's job history for the past 8 years. Any job she left off her resume was not due to any problem with that job, and was not an effort to "hide" anything. For instance, she left off a position at Kindred Hospital in Oklahoma, City (from 2003 to 2005) where she was named "CEO of the Year."

14.     Although she submitted her resume and a cover letter to Defendant on March 12, 2014, she did not receive any kind of a response until June 3, 2014. On that date, Plaintiff received a telephone call from Becky McCune, Defendant's Human Resources director, requesting a telephone interview between Plaintiff and the Board of Directors. Ms. McCune also sent Plaintiff a questionnaire that she was to fill out prior to the telephone interview.

15.     Plaintiff's telephone interview with the Board of Directors occurred on June 11, 2014. Thereafter, Plaintiff was invited to do an on-site interview on July 7, 2014.

16.     Plaintiff's on-site interview with Defendant was quite extensive and lasted an entire day. It began first thing in the morning with an interview with the Board, then Plaintiff met with the Defendant's executive team and department directors, and next she had lunch with the medical staff. In the afternoon there were three employee sessions (all three were also attended by at least two Board members), a community tour, a meeting with city officials, followed by another interview and then a dinner with the Board. Plaintiff was asked by Ms. McCune to provide a reference list, which she prepared and provided to Ms. McCune, but at no time was Plaintiff asked to fill out an employment application, a complete job history, or a background check authorization. At no time during her day-long interview was she asked

3

questions by any Board member about her resume or her job history beyond her most recent position.

17.     On July 22, 2014, Plaintiff received a rejection via email from Ms. McCune on behalf of Defendant, stating that the Board had decided to continue their search for a CEO.

18.     Thereafter, on July 30, 2014, Plaintiff received an email from one of Defendant's board members – Neal Barkley – stating that the Board had received some misinformation and asking if Plaintiff would still consider the CEO position.  Plaintiff responded that she would still be interested, but inquired as to the nature of the misinformation.  Mr. Barkley responded that a hospital employee had checked Plaintiff's references, and rather than giving the information to the full Board had instead given it to only one Board member.  Mr. Barkley stated that he was concerned the information had been "filtered."  He asked Plaintiff to resubmit a list of references to him, and he would have the Board members contact them directly.  Plaintiff resubmitted her list of references as requested.

19.     On August 8, 2014, Mr. Barkley requested – via email – that Plaintiff send additional references from earlier in her career.  Plaintiff complied with the request.  She thereafter received feedback from the Board chairman and other Board members that the references were very positive or even "glowing."

20.     On August 13, 2014, Mr. Barkley telephoned Plaintiff and offered her the CEO position, which she accepted.  The hiring process had taken nearly seven months, and it had included lengthy interviews and three separate reference checks of multiple references.

21.     On August 25, 2014, Plaintiff received a written Employment Agreement and a letter dated August 19, 2014, from Defendant.  The letter, signed by the Board chairman, Judy Hiner, stated that "We believe you are the right person to lead our team in making a difference in

healthcare for our community."  Plaintiff signed the Employment Agreement on August 25, 2014.  (The Employment Agreement is attached to this Complaint as **Exhibit A**.)

22.     At no time prior to receiving the Employment Agreement was Plaintiff asked to fill out an employment application, to list her full job history, or to sign an authorization for a background check.

23.     Pursuant to the Employment Agreement, the term of the contract was for 36 months, commencing on October 1, 2014 and ending September 30, 2017.  The base salary set forth in the Agreement was $210,000 per year.  Additionally, the Agreement provided that Plaintiff was to receive all benefits available to regular, full-time employees of Defendant.  The Agreement further provided that Plaintiff was eligible to receive an incentive bonus up to 25% of her base salary for achieving a 4% operating margin. (**Exhibit A, ¶6(f)**.)

24.     As to termination, the Agreement provided that if Defendant terminated the Agreement prior to the expiration of the term of the Agreement, then it would pay the Plaintiff the balance of the annual salary due under the remaining term of the Agreement.  (**Exhibit A, ¶7(a).**)

25.     The Agreement further provided that if the Defendant terminated the Plaintiff "for any of the causes specifically defined as Misconduct Subject to Disciplinary Action under CRMC's Personnel Policies," then they would be liable for compensation only up to the date of the violation.  Plaintiff was not provided a copy of the Personnel Policies at any time prior to receiving her Employment Agreement. (**Exhibit A, ¶7(b).**)

26.     The Agreement contained no provision stating that employment was contingent on the completion of a background check.

27.     Following the execution of the Employment Agreement, Plaintiff made arrangements to move from New Mexico to Coffeyville, Kansas, and also began doing work for the Defendant even though her employment did not officially begin until October 1, 2014.

28.     During the month of September, 2014, Plaintiff performed, among other things, the following tasks for Defendant:  Drafted a new CFO job description; reviewed and screened CFO candidate resumes; participated in telephone conference calls regarding physician recruitment; contacted and worked with physician recruitment firms; reviewed Emergency Room contract proposals; reviewed financial statements, productivity reports and budget assumptions; participated in numerous conference calls on a variety of matters; participated in budget planning for 2015; met with Defendant's attorney concerning Stark issue; attended Board finance committee meeting on September 23, 2014; attended Board meeting on September 24, 2014.

29.     Plaintiff moved to Coffeyville, Kansas on September 21, 2014, and signed a one year lease on a house.

30.     On September 24, 2014, Plaintiff attended a new hire orientation at the hospital and filled out tax and I-9 forms and was also asked to sign a background check authorization, which she did.

31.     The background check authorization specifically stated, "I further understand that I may request a complete and accurate disclosure of the nature and scope of the background verification, to the extent such investigation includes information bearing on my character, general reputation, personal characteristics or mode of living."  (The Background Verification Disclosure is attached to this Complaint as **Exhibit B**.)

32.     Plaintiff reported to work at Defendant's hospital on October 1, 2014.  Plaintiff
had previously been performing work and was ready and able to perform the work anticipated by
her Employment Agreement.

33.     Shortly before noon on Plaintiff's first day of work while she was meeting with
the Defendant's CFO, the Board chairman, Judy Hiner, came to Plaintiff's office and asked her
to accompany her to a special Board meeting.

34.     When Plaintiff entered the room where the Board members were present, she was
immediately accused of having falsified her resume.  She was told a background check had
shown discrepancies.  She managed to state that she did have an inadvertent error on two dates
on her resume but that absolutely everything else contained in her resume was correct.  She was
not shown any documentation or given any further chance to explain.  She was subjected to
yelling and even cursing by some members of the Board. Plaintiff asked for a copy of the
background check, but it was not provided.  The meeting lasted for no more than 10 minutes, and
Plaintiff was told she was being placed on leave and was to go home rather than back to work.

35.     On Monday, October 6, 2014, the Defendant's attorney – M. Doug Bell —
informed plaintiff that her contract was being terminated and that she would be paid for October
1 through October 6, 2014.

36.     On October 10, 2014, Mr. Bell gave Plaintiff a letter and her paycheck in the
amount of $3,230.72, less deductions.  In the letter, Mr. Bell claimed that the contract was "null
and void" due to alleged "resume fraud."   He also presented Plaintiff with a "Cancellation
Agreement and Mutual Release and Confidentiality Agreement," that she was asked to sign,
releasing any rights she might have against the Defendant in exchange for the Defendant
foregoing repayment of her costs that it had paid (per the Employment Agreement) for her move

from New Mexico to Kansas in an amount of $16,242.56, plus the cost of her medical screening, for a total of $16,506.56.  Plaintiff did not sign this Agreement.

37.     Although Plaintiff again requested from Mr. Bell a copy of her background check, it was not provided.  Defendant since has claimed that Defendant simply did an in-house internet search after Plaintiff had begun working and that no background check was ever conducted.

38.     Following the termination of her Employment Agreement, Plaintiff received reports from Coffeyville citizens who were not on the Board of Directors of the Defendant that they had been told that Plaintiff had committed fraud and was being let go.

39.     Plaintiff thereafter made demand on Defendant to pay her the remaining salary due her under the Agreement's three-year term, but the Defendant refused.

40.     Without a job, Plaintiff had no reason to remain in Coffeyville, Kansas, so she moved back to Albuquerque, New Mexico, and incurred costs in relocating and cancelling her lease.

41.     In early December 2014, Plaintiff received notice dated September 26, 2014 from First Advantage Background Services Corp. ("First Advantage") that Defendant had requested a background search, and that public record information regarding Plaintiff had been reported by First Advantage to Defendant.

42.     The letter from First Advantage included a copy of the results of the background search.

43.     Also in early December 2014, Plaintiff received notice dated September 28, 2014 from Equifax Information Services LLC ("Equifax") that First Advantage had requested a copy of her credit file. The notice further informed Plaintiff of her right to request a free copy of her Equifax credit file, should she be declined employment based upon information in that file.

44.     Both notices from Equifax and First Advantage were mailed to Plaintiff's former address in New Mexico, and, due to a mix up at the United States Post Office, were not forwarded to Plaintiff until early December, 2014.

## COUNT ONE – BREACH OF CONTRACT

45.     Plaintiff incorporates by reference, as if fully set forth herein, paragraph 1 through 44 of this Complaint.

46.     Plaintiff and Defendant entered into a written Employment Agreement dated August 25, 2014, with an effective date of October 1, 2014.

47.     Prior to entering this Agreement, the Defendant had a full opportunity to engage in due diligence to vet the Plaintiff and conduct all necessary background checks.

48.     In reliance on the Employment Agreement, Plaintiff moved from Albuquerque, New Mexico to Coffeyville, Kansas and began work for Defendant under the terms of the Agreement.

49.     At all relevant times, Plaintiff was ready and willing to perform under the Employment Agreement, and had begun performance.

50.     Defendant breached the Employment Agreement with Plaintiff when it terminated the Employment Agreement without cause and refused to pay the remaining salary owed under the Agreement's three year term in compliance with paragraph 7(a) of the Agreement.

51.     As a result of Defendant's breach of the Employment Agreement, Plaintiff has incurred actual and incidental damages, including damage to her professional reputation.

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendant for all actual damages due under the Employment Agreement, as well as incidental damages for breach of contract, and such other and further relief as this Court deems just and proper.

## COUNT TWO – VIOLATION OF THE FAIR CREDIT REPORTING ACT

52.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 51 of this Complaint.

53.     Upon information and belief, any applicant with a hospital – particularly an applicant for the position of the Chief Executive Officer – would be required to undergo a background check before hiring.

54.     Based on communications from both First Advantage and Equifax, a background check on Plaintiff was performed at the request of Defendant.

55.     The Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* requires that if an employer is to take adverse action against an employee based on information in a consumer report, the employer must provide a copy of the report to the employee, a notice of rights under the FCRA, and that the employee has the right to dispute the accuracy or completeness of the report.  15 U.S.C. §1681b.

56.     Plaintiff was not provided a copy of the background report on which Defendant allegedly based its decision to take adverse action.

57.     Further, Defendant explicitly represented that no background check beyond a simple internet search was performed.

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendant for back and front pay, including lost benefits, for statutory penalties, punitive damages, and for attorney fees, costs and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby requests a trial by jury on all issues herein.

## DESIGNATION OF TRIAL

Pursuant to D. Kan. Rule 40.2, Plaintiff designates Wichita, Kansas as the place of trial in the above-captioned matter.

Respectfully submitted,

MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHTD.

/s/ Diane S. Worth
Diane S. Worth, #12226
Ryan M. Peck, #21223
300 N. Mead, Suite 200
Wichita, KS 67202-2745
Telephone:      316-262-2671
Facsimile:      316-262-6226
Email: dworth@morrislaing.com
              rpeck@morrislaing.com

*Attorneys for Plaintiff*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT made and entered into as of this _25th_ day of _August_, 2014, by and between Coffeyville Regional Medical Center, a not-for-profit Kansas corporation, hereinafter referred to as "CRMC" and Kathleen Cahill, hereinafter referred to as "CEO". CRMC and CEO are sometimes individually referred to as "Party" and collectively as "Parties".

WHEREAS, CRMC desires to employ the services of Kathleen Cahill as Chief Executive Officer of CRMC;

WHEREAS, CEO has the necessary education, experience, skills and expertise to serve as CEO, and desires to accept such employment;

WHEREAS, the Parties desire to execute this Employment Agreement in order to set forth the terms and conditions of employment of CEO.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Parties agree as follows:

1.      Employment.  CRMC employs CEO on the terms and conditions hereafter stated as CEO of CRMC, to perform the functions and duties of said office as set forth by the bylaws of CRMC Board of Directors and to perform such other legally permissible and proper duties and functions as the Board of Directors shall assign to CEO.  CEO agrees to perform such services for CRMC on the terms and conditions herein stated.

1

**EXHIBIT A**

2.    Term of Employment. This agreement shall be for a term of thirty-six (36) months, commencing October 1, 2014, and ending September 30, 2017. CRMC's Board of Directors will consider renewal at least one (1) year prior to the expiration of any term. In the event CRMC does not elect to renew this Agreement, the Parties' employment relationship and the CEO's appointment as CEO shall end at the expiration of the given term unless the Agreement is otherwise terminated.

3.    CEO's Commitments. CEO shall be the chief executive officer of CRMC and be responsible to CRMC for the proper administration of all affairs of CRMC. CEO shall perform all of the duties of CEO as set forth in the bylaws of CRMC Board of Directors. CEO shall also perform other legally permissible and proper duties and functions as the Board of Directors may assign from time to time.

4.    Conflict of Interest. CEO shall not engage in any business or transaction or have a financial or other personal interest or association, direct or indirect, which is in conflict with the proper discharge of official duties or would tend to impair independence of judgment or action in the performance of official duties per CRMC's conflict of interest policy.

5.    Board of Director Commitments. The Board of Directors will:

a.    Set policy for the governance and administration of CRMC, and implement its policies through the CEO.

b.    Spend sufficient time working with CEO to set goals and priorities for CRMC.

c.    Conduct an annual review of CEO during October of each year.

2

6.   Compensation.   CRMC shall pay CEO a sign on bonus of Fifteen Thousand Dollars ($15,000.00) for moving expenses.

CRMC shall pay CEO for services hereunder a base annual salary of Two Hundred Ten Thousand Dollars ($210,000.00) payable in bi-monthly installments in accordance to CRMC pay schedule. In addition to the base annual salary, CEO shall receive the following benefits:

a.   All holiday and leave benefits, retirement and pension systems contributions, group health and dental insurance, and other fringe benefits, to the same extent such benefits are provided to regular, full-time employees of the CRMC.

b.   Personal time off (PTO) will accrue based on CRMC policies starting at a Director level.

c.   Reimbursement of all expenses reasonably and necessarily incurred because of employment-related business and/or travel, per CRMC travel policy.

d.   With prior approval of Board of Directors, travel and expense reimbursement to attend such educational programs as the Parties may agree.

e.   Payment of such professional organization dues as are already budgeted for the office of CEO and all other professional organization dues which the Parties agree will benefit CEO in the performance of her duties.

f.   An incentive bonus of 25% of CEO's base salary for achieving a 4% operating margin or a bonus of 10% of CEO's base salary for 1% operating margin. The bonus will be paid upon the presentation and approval of the annual auditor's report.

3

7.    Separation.

a.    In the event CEO is terminated by CRMC prior to the expiration of the applicable term, then in that event CRMC agrees to pay CEO a cash payment equal to the balance of the base annual salary due CEO under the then current agreement. CEO shall also be compensated for all accrued but unused benefits to date of termination.

b.    Notwithstanding the foregoing provisions, if CEO is terminated for any of the causes specifically defined as Misconduct Subject to Disciplinary Action under CRMC's Personnel Policies, or a violation of a term or condition of this Employment Agreement, upon such termination CEO shall be entitled to only the compensation and benefits accrued up to the date of termination.

c.    In the event CEO becomes totally disabled or dies during her employment with CRMC, then CRMC's only obligation (other than those that may be provided by insurance) to CEO shall be payment of accrued but unpaid compensation to include aggregate salary, accrued vacation pay and any other accrued benefits up until the date of her total disability or death.

8.    Miscellaneous.

a.    If any part(s) of this Agreement is found by a court of competent jurisdiction to be illegal or unenforceable, such part(s) shall be regarded as though not part of this Agreement and the remaining portions shall be fully binding and enforceable by the Parties hereto.

b.    This Agreement represents the entire agreement of the Parties, and no representations have been made or relied upon except as set forth herein. This Agreement

4

may be amended at any time by mutual agreement of the Parties. Any amendments are to

be negotiated, put in writing, and adopted by the Board of Directors.

IN WITNESS WHEREOF, the Parties have executed this Employment Agreement as of the

day first above written.

COFFEYVILLE REGIONAL MEDICAL                    CHIEF EXECUTIVE OFFICER
CENTER, a Kansas not-for-profit corporation

_Judith Diner_                                  _Kat Cahill_
                                                KATHLEEN CAHILL

5



# COFFEYVILLE REGIONAL
# MEDICAL CENTER, INC.

## BACKGROUND VERIFICATION DISCLOSURE

In accordance with the Fair Credit Reporting Act, as amended by the Consumer Reporting Reform Act of 1996, Coffeyville Regional Medical Center, Inc. ("the Hospital"), is required to advise you that, for purposes of employment only, a Consumer Report and/or an Investigative Consumer Report may be made which may include information about your credit standing, credit capacity, character, general reputation, personal characteristics, work habits, mode of living, driving record, judgments, liens, arrests and convictions. The Hospital contracts the services of Secure Point, A Service of ChoicePoint Services, Inc. ("the agency"), 13950 Ballantyne Corporate Place, Suite 200, Charlotte, North Carolina 28277-2712, to provide these reports.

If a Report is made, and the Report contains information regarding your character, general reputation, personal characteristics, or mode of living, additional information as to the nature and scope of the report will be provided to you upon written request.

## AUTHORIZATION and RELEASE

I authorize the Hospital and any of its affiliates or its designated investigative agency to make whatever inquiries it may deem necessary in association with my application for employment and/or my continued employment. As part of such inquiries, the Hospital, the affiliate, and the agency have my permission to contact persons who may have information relating to my suitability for employment and to secure a Consumer report and/or an Investigative Consumer Report.

I understand that information obtained by the Hospital, the affiliate, or the agency in accordance with this authorization may include, but is not limited to, information pertaining to my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, work habits, mode of living, driving record, judgments, liens, arrests and convictions. This report may be compiled with information from credit bureaus, court record repositories, department of motor vehicles, past or present employers and educational institutions, governmental occupational licensing or registration entities, business or personal references, and any other source required to verify information that I have voluntarily supplied. I further understand that I may request a complete and accurate disclosure of the nature and scope of the background verification; to the extent such investigation includes information bearing on my character, general reputation, personal characteristics or mode of living.

I authorize the Hospital and its affiliates, without reservation, to furnish copies of this authorization and my application to any person(s) and/or consumer-reporting agency in connection with the above purposes.

The Applicant/Employee must read and initial the following statements:

1. I understand this authorization will expire on 𝟷 𝟶 /𝟸𝟺 / 𝟷⁴ (MM/DD/YR)  Initials _____
2. I understand I may revoke this authorization at any time by notifying Coffeyville Regional Medical Center, Inc. in writing, but if I do so it will not have any effect on any actions they took before they received the written revocation.  Initials: _____

Applicant/Employee Name (Printed) Note: print also any other names used

_02 / 18 / 52_                 _5 85 58 / 3 99_     _5284362554 / XM / 03/18/2019_
Date of Birth (MM/DD/YR)       Social Security Number    Drivers License # / State of Issue / Expiration Date

_____
Signature and Date

**EXHIBIT B**